**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

SAMANTHA F.,
on behalf of R.B.K.F.,

              **Plaintiff,**

   v.                               **Civil Action 2:22-cv-2368**
                                       **Magistrate Judge Kimberly A. Jolson**

COMMISSIONER OF
SOCIAL SECURITY,

              **Defendant.**

## OPINION AND ORDER

Plaintiff, Samantha F., acting on behalf of R.B.K.F., a minor, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying R.B.K.F.'s application for Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 14) and **AFFIRMS** the Commissioner's decision.

I.      **BACKGROUND**

Plaintiff is R.B.K.F.'s mother and legal guardian, who protectively filed an application for SSI on R.B.K.F.'s behalf on November 14, 2019, alleging that he was disabled beginning March 28, 2019. (R. at 420–26). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on March 16, 2021. (R. at 327–40). On March 29, 2021, the ALJ issued a decision denying Plaintiff's application for benefits. (R. at 221–33). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on June 2, 2022 (Doc. 1), and the Commissioner filed the administrative record on August 19, 2022 (Doc. 9). The matter has been briefed and is ripe for consideration. (Docs. 14, 16, 17).

### A.    Personal Background

R.B.K.F. was born in 2019. He was a newborn/young infant on November 14, 2019, the date application was filed, and at the time of the administrative hearing, was considered an older infant/toddler. (R. at 225).

### B.    Relevant Hearing Testimony

The ALJ summarized R.B.K.F.'s mother's testimony as follows:

> At the hearing, [R.B.K.F.]'s mother, Samantha F. testified on behalf of her son at the hearing. Ms. F. testified that [R.B.K.F.] will be two years old in twelve days. He began on infusions in October 2019. She testified that his impairments continue to affect his functioning, which has included seizures. She indicated his infusions are every two weeks at their home, since December 2019 (nurses come to administer it). Ms. F. testified that her son has had side effects from the infusions, including frustration, anger, and beating his head on things. She has given him ibuprofen for fevers that sometimes result from infusions. He has also thrown up and had diarrhea because of the infusions. Ms. F. testified that the infusions are a lifelong situation. She further indicated that he would likely have to remain in isolation, and home schooling due to his condition. (Hearing testimony).

(R. at 227).

### C.    Relevant Medical Evidence

The ALJ summarized R.B.K.F.'s medical records as follows:

> The record indicates [R.B.K.F.] was diagnosed with hypogammaglobinemia. (Ex. 2F). [R.B.K.F.] was treated with intravenous immunoglobulin (IVIG) infusion therapy. (Exs. 4F, 14F-7). The record reveals that [R.B.K.F.] did well with treatment and had normal findings on examination. (Exs. 5F-32, 6F). An EEG taken on January 9, 2020 was within normal limits. (Ex. 5F). On February 28, 2020, [R.B.K.F.] had upper respiratory infection symptoms and diarrhea. He had been gaining weight well. With a few of the IVIG infusions, a couple hours afterwards, he will have episodes where he will sometimes turn blue with eating, but also without eating. His weight had been excellent over the past couple months. Treatment notes from March 2020 show that [R.B.K.F.]'s weight gain had been excellent over the past few months. (Ex. 6F).

2

Pediatric Associates of Lancaster records from April 6, 2020, showed ecchymosis to left the left eye with two abrasions, scabbed, no crusting, no draining, no swelling, and an otherwise normal physical examination, with normal development. The following month, records noted fatigue, and nonfamilial hypogammaglobinemia. (Exs. 6F, 11F)

Records from Pediatric Ophthalmology Associates on April 17, 2020 indicated [R.B.K.F.] fell and hit his left eye, then had an infusion five days later. He was reportedly squinting. Nystagmus occurred only a few times. At a return visit on June 22, 2020, the following was noted: alternating intermittent estropia, hypermetropia of both eyes, regular astigmatism of both eyes, and congenital hypogammaglobinemia. (Ex. 7F).

Help Me Grow records from July 2020 indicate [R.B.K.F.] showed occasional use of some age expected skills, but more of his skills were not yet age expected relative to same age peers. (Ex. 10F-6). That same month, [R.B.K.F.]'s omeprazole medication was refilled. (Ex. 12F-209).

[R.B.K.F.] returned to Pediatric Associates of Lancaster in January 2021 for a well visit. At that time, [R.B.K.F.]'s mother reported better sleep, daily naps, and eating a well-balanced diet with appropriate milk intake. A gastrointestinal examination was normal. An overall physical exam was normal throughout as well. (Ex. 16F-1-3). [R.B.K.F.]'s medications were refilled and adjusted and he continued IVIG infusions at that time as well. (Exs. 18F-177, 21F).

Later that month, [R.B.K.F.] returned to Help Me Grow. These records note [R.B.K.F.] showed many age expected skills, but continued to show some functioning that might be described like that of a slightly younger child in the area of child outcome. (Ex. 19F-5).

In February 2021, [R.B.K.F.]'s mother noticed constant eye crossing, which eventually became intermittent, and mostly noticed when he was tired, especially after infusions. His alignment improved after using A1percentage. His provider, Dr. Julie M. Lange, M.D., held off on restarting atropine at that time. (Ex. 20F-1-3). An infusion was performed in late February 2021, with no complications. (Ex. 22F-2).

(R. at 227–28).

## C.     The ALJ's Decision

The ALJ first found that R.B.K.F. was a newborn/young infant on November 14, 2019, the

date application was filed, and an older infant/toddler of the date of the decision.  (R. at 225).

Next, he found that R.B.K.F. had not engaged in substantial gainful activity since his application date. (*Id.*). At the next step of the sequential evaluation process, the ALJ concluded that R.B.K.F. had severe impairments including failure to thrive, anemia, immunity deficiency, and Pharyngeal dysphagea. (*Id.*). He also found that R.B.K.F.'s impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments, or functionally equal those requirements. (*Id.*).

The ALJ determined that in the six domains of functioning that are pertinent to a child's benefits application, R.B.K.F. had no limitations in: acquiring and using information, attending and completing tasks, and interacting and relating with others. R.B.K.F. was found to have less than marked limitations in moving about and manipulating objects, caring for himself, and in health physical well-being. (R. at 226). Because a finding of one "extreme" limitation or two "marked" limitations is needed in order to support an award of benefits, the ALJ denied Plaintiff's claim. (R. at 229).

## II. STANDARD OF REVIEW

To qualify for SSI as a child under the age of 18, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.* An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

4

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

The Sixth Circuit has summarized the regulations concerning a child's application for

disability benefits as follows:

The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":

(1) Acquiring and using information;
(2) Attending and completing tasks;
(3) Interacting and relating with others;
(4) Moving about and manipulating objects;
(5) Caring for yourself; and
(6) Health and physical well-being.

§ 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:

"Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. § 416.926a (e)(2)(i).

"Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416. 926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

In the context of that legal framework, this Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## IV.    DISCUSSION

Plaintiff contends that the ALJ failed to engage in a proper analysis of whether R.B.K.F.'s immune deficiency disorder equaled Listing 114.07. (Doc. 14 at 6–10). Plaintiff also argues that the ALJ failed to properly evaluate the medical source statement provided by Rachael Hall, a certified nurse practitioner. (*Id.* at 10–13).

### A.  Listing 114.07

Plaintiff says that though the ALJ discussed Listing 114.07 in his decision, he simply found that the listing was not met, without further considering whether it was medically equaled. (*Id.* at 7). The Commissioner counters that the ALJ properly considered the suggestion from Plaintiff's counsel—and two medical providers—that R.B.K.F.'s biweekly IVIG injections were equivalent to stem cell tranplantation, but ultimately found that comparison unsupported. (Doc. 16 at 6–10).

6

The Court agrees that the ALJ adequately supported his determination that the Listing was not met or medically equaled, and this assignment of error is without merit.

Listing 114.07 requires evidence to establish that R.B.K.F. meets or equals the following criteria:

Evidence of immune deficiency disorder, excluding HIV infection, with:

**(A)** one or more of the following infections: sepsis, meningitis, pneumonia, septic arthritis, endocarditis, or sinusitis, that are either resistant to treatment or require hospitalization or intravenous treatment three or more times in a 12-month period; or

**(B)** stem cell transplantation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1.  Plaintiff concedes that "[t]he listing was not met because the specific evidence required to meet the listing was not in the evidence."  (Doc. 17 at 3). However, Michele Hensley, MD, and Ms. Hall each opined that R.B.K.F.'s treatment was medically equivalent to stem cell transplantation, and Plaintiff says the ALJ did not adequately explain why he rejected those opinions.  (*Id.* at 2–4).

The ALJ discussed Listing 114.07 as follows:

[R.B.K.F.]'s representative argued that [R.B.K.F.] meets listing 114.07. He argued that [R.B.K.F.]'s biweekly injections given at home were the same as stem cell implantation. Listing 114.07 requires immune deficiency disorders with stem cell transplantation. Consider under a disability until at least 12 months [from] the date of transplantation. Thereafter, evaluate any residual impairment(s) under the criteria for the affected body system. As described above, this listing specifically requires stem cell implantation, which [R.B.K.F.] did not receive. Therefore, [R.B.K.F.] does not meet or equal this listing.

(R. at 225).

The ALJ clearly rejected that R.B.K.F. met or medically equaled Listing 114.07.  He did not meet the listing because the "listing specifically requires stem cell implantation, which [R.B.K.F.] did not receive." (*Id.*).  Moreover, the ALJ noted the argument that the IVIG injections

were equivalent but found that R.B.K.F. did not equal the listing.  (*Id.*).  Without more, it would

be difficult to trace the ALJ's precise reasoning, but an ALJ's opinion must be read as a whole.

*Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014).  The only direct support of

medical equivalence came from the opinions of Dr. Hensley and Ms. Hall, and the ALJ elsewhere

explained why those opinions were unpersuasive.

> The ALJ noted that Ms. Hall:

> opined that the claimant's immune deficiency disorder and the required medical treatment is at least of equal medical significance to that of an immune deficiency treated by stem cell transplantation. (Ex. 13F). This opinion is unpersuasive, as Ms. Hall does not provide any reasoning or support for this statement.

(R. at 229).  The ALJ further noted that Dr. Hensley issued a concurring opinion, which was

unsupported and unpersuasive for the same reasons.  (*Id.*).  An ALJ is not required to "defer or

give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or

prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R.

§ 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions

or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the

[Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical

source has familiarity with the other evidence in the claim or an understanding of [the SSA's]

disability programs policies and evidentiary requirements."  20 C.F.R. § 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must

explain how they were considered.  20 C.F.R. § 416.920c(b)(2).  When evaluating supportability,

the more relevant the objective medical evidence and supporting explanations presented by a

medical source are to support the medical opinion, the more persuasive the ALJ should find the

medical opinion.  20 C.F.R. § 416.920c(c)(1).  When evaluating consistency, the more consistent

a medical opinion is with the evidence from other medical sources and nonmedical sources in the

claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2).

Here, the ALJ rejected Dr. Hensley's and Ms. Hall's opinions because they lacked supportability. Specifically, they failed to "provide any reasoning or support" for their statements that R.B.K.F.'s treatment was equivalent to stem cell transplantation. (R. at 229). Indeed, each provider submitted only a two-page questionnaire, in which they merely circled "yes" in response to the question "is your patient's immune deficiency disorder and the required medical treatment at least of equal medical significance to that of an immune deficiency treated by steam cell transplantation?" (R. at 1815–16, 1831–32). Neither provider gave any accompanying explanation nor cited any supporting evidence.

The opinions were also inconsistent with the state agency consultants, whose opinions the ALJ found persuasive. (R. at 228). Both consultants, despite finding that immune deficiency disorder was one of R.B.K.F.'s severe impairments, ultimately concluded that R.B.K.F. did not met or medically equal any listing. (R. at 344, 351).

In sum, the only evidence of record directly supporting that Plaintiff's immune deficiency disorder was medically equivalent to that outlined in Listing 114.07 were the opinions of Dr. Hensley and Ms. Hall. Yet, the ALJ's opinion describes why those opinions were unsupported, inconsistent, and therefore unpersuasive. Accordingly, there is no difficulty in tracing the ALJ's path of reasoning in rejecting Plaintiff's medical equivalence argument.

Still more, Listing 114.07 requires evidence of both one of the enumerated infections in Section A and stem cell transplantation. Even if R.B.K.F.'s IVIG treatment was medically equivalent to stem cell transplantation, Plaintiff has not adduced any evidence—nor does the Court

find any upon its own review—that R.B.K.F. suffered from any infection as defined in Section A,

nor an infection that could be considered medically equivalent.  In fact, the ALJ noted in his

opinion that R.B.K.F.'s immune disorder "was treated with infusions, but he had no serious

infections, just fever and rash at times[.]"  (R. at 228).  Without the additional supporting criteria,

any error made by the ALJ regarding stem cell transplantation is harmless.  For all these reasons,

Plaintiff's allegation of error is without merit.

### B.  Evaluation of Ms. Hall's Medical Source Statement

Plaintiff next says that the ALJ violated 20 C.F.R. § 416.920c during his evaluation of the

medical source statement completed by Ms. Hall, R.B.K.F.'s treating certified nurse practitioner.

(Doc. 14 at 10–13).  As described above, the regulations dictate that the ALJ's opinion must

describe how he considered the supportability and consistency of each medical opinion.  The

Commissioner says that the ALJ did so here.  (Doc. 16 at 10–18).  The Court agrees.

> In discussing the opinion provided by Ms. Hall, the ALJ found:

> Rachael Hall, a certified nurse practitioner, opined that the claimant's immune
> deficiency disorder and the required medical treatment is at least of equal medical
> significance to that of an immune deficiency treated by stem cell transplantation.
> (Ex. 13F). This opinion is unpersuasive, as Ms. Hall does not provide any reasoning
> or support for this statement. She also found extreme limitation in caring for
> himself, which is unsupported by the overall record, as there is little in the record
> showing any limitation in that area, particularly considering the normal
> examinations noted above. (Ex. 6F, 11F). Consequently, these opinions are
> unpersuasive.

(R. at 229).  Plaintiff says the treatment of this opinion is particularly significant because had the

ALJ adopted Ms. Hall's finding that R.B.K.F. had an extreme limitation in caring for himself, it

would establish a functional impairment equal to the listings under 20 C.F.R. § 416.926a(d), and

lead to a disability finding.  (Doc. 14 at 11).

As was described above, the ALJ noted that Ms. Hall's opinion was at times without any

supporting explanation.  (R. at 229).  The opinion was only two pages and consisted primarily of yes/no or checkmark answers.  (R. at 1815–16).  Ms. Hall did offer a few sentences explaining her conclusion that R.B.K.F. was extremely limited in his ability to care for himself, though it seems unclear how her statement that "[R.B.K.F.]'s emotional & physical needs are met in appropriate ways for an 18 month old toddler" aligns with an extreme limitation conclusion.  (R. at 1816). Regardless, the ALJ noted that the conclusion was unsupported by Ms. Hall's own treatment notes and the notes of her colleagues at Pediatric Associates of Lancaster, which he stated showed "normal examinations."  (R. at 229) (citing R. at 1386–1503, 1540–62).  Indeed, those records consistently reflect normal findings in motor, behavioral, neurological, and language development. (R. at 1388–89, 1392, 1394, 1397, 1400, 1835) (normal findings from providers, including Ms. Hall, from May 2019 through January 2021).  In other words, the ALJ described how Ms. Hall's opinion lacked support from her own objective medical evidence.

Further, the ALJ found the opinion inconsistent with "the overall record, as there is little in the record showing any limitation in" caring for oneself.  (R. at 229).  In fact, the ALJ concluded that [R.B.K.F.] had a "less than marked" limitation in the ability to care for himself (R. at 226), and described in detail the substantial evidence leading to that conclusion.  The ALJ found that though R.B.K.F. was impaired by hypogammaglobinemia and failure to thrive, and his IVIG treatment caused side effects, he largely "did well with treatment and had normal findings on examination."  (R. 227) (citing R. at 1318 (note that R.B.K.F. was "doing well on immunoglobulin replacement"), 1386–1503 (normal examination findings)).  For instance, the ALJ noted that by February 2020 R.B.K.F. was "gaining weight well" and treatment notes continued to demonstrate the same.  (R. at 227) (referring to R. at 1341) (February 2020 progress notes stating "On review of [R.B.K.F.'s] growth chart, he has actually been gaining well."); (*see also* R. at 1699) (July 2020

11

note that "On review of his growth chart, he has actually been gaining weight well."); (R. at 1877) (October 2020 note that "growth has been excellent and he is currently at the 14th percentile for weight and the 1st percentile for length."); (R. at 1934) (December 2020 note that he was gaining weight well).  The ALJ further noted that while July 2020 records showed both age-expected and below-age-expected skills, records in January 2021 "showed many age[-]expected skills[.]"  (R. at 228) (citing R. at 1522–24, 2039–41); (*see, e.g.,* R. at 1524) (July 2020 statement that R.B.K.F. was not yet using skills expected of his age in "beginning to take care of his . . . own needs"); (R. at 2041) (January 2021 statement that R.B.K.F. showed many age-expected skills in "beginning to take care of his . . . own needs").  Finally, the ALJ relied upon the state agency consultants, both of whom opined that R.B.K.F. had a less than marked limitation in caring for himself and noted that "although [R.B.K.F.] was struggling with failure to thrive and low weight gain with a Body Mass Index (BMI) at three and under for his age/gender until around August 2019, with therapies and infusions, [he] began gaining weight at a more appropriate rate showing a BMI percentage of 6.24 with normal tone and no focal deficits as of November 2019."  (R. at 228).  All told, the ALJ described why he concluded the overall evidence of record supported a less than marked limitation in caring for oneself, and why Ms. Hall's opined extreme limitation was therefore inconsistent with the overall record.

Because the ALJ considered the supportability and consistency of Ms. Hall's opinion, and detailed substantial evidence for finding that the opinion was unpersuasive, the Court finds Plaintiff's allegation of error without merit.

## V.     CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 14) and **AFFIRMS** the Commissioner's decision.

12

IT IS SO ORDERED.


Date:   February 22, 2023                           /s/ Kimberly A. Jolson
                                                    KIMBERLY A. JOLSON
                                                    UNITED STATES MAGISTRATE JUDGE